MEMORANDUM OF DECISION
On January 28, 2000, the Department of Children and Families secured an order of temporary custody and filed neglect petitions, alleging that Katherine and Alexandra W. were:
 1) being permitted to live under conditions, circumstances or associations injurious to their well-being, and
 2) had been abused and had a condition, which is the result of maltreatment such as, including but not limited to, malnutrition, sexual molestation or exploitation, deprivation of necessities, emotional maltreatment or cruel punishment.
The summary of facts reveals that these allegations were against the mother of the children, Heather W., now Heather C. only. The two children, Katherine and Alexandra, were then ages four and one half and three, respectively, and were placed in the custody of their father, John W.
The previous year, in March, 1999, Heather C. had filed an action for the dissolution of her marriage to her husband. The parties shared CT Page 13286 temporary joint legal and physical custody of their daughters, spending an equal amount of time in each household. At the same time that the neglect case commenced, the dissolution case was in the process of being referred to the Regional Family Trial Docket, as the parties had contested claims for custody of their two daughters. Given that the Superior Court for Family Matters would not hear the custody claims until after the Superior Court for Juvenile Matters determined the outcome of the neglect petitions, the matters were consolidated and referred to the Child Protection Session for trial. This court accepted the referral in the interests of judicial economy because the evidence and claims concerning custody of the children and their best interests were common to both cases. On April 4, 2000, the parties reached an agreement concerning their pending dissolution case. with the exception of custody and support and related claims. Their marriage was dissolved and orders entered regarding the disposition of their property. (Higgins, J.)
Trial on both pending matters began on July 24, 2000 and continued over ten days to August 30, 2000, at which time the parties concluded the presentation of their evidence and made their closing arguments. The court heard from many witnesses and received voluminous exhibits. At the closing argument and since that time, Heather C. presented and has renewed her claim for additional evidence concerning her former husband's earning capacity and present earnings and the competing claims for child support. The court granted the motion for additional testimony and evidence on October 17, 2000 and also severed the financial decisions regarding child support and other financial orders from the pending custody claims.
For the reasons set forth in detail below, the court finds from a preponderance of the evidence that DCF made more than reasonable efforts to prevent the removal of the children from the care of their mother. The court further finds, that given the events of the summer and fall of 1999, as well as January, 2000, Katherine and Alexandra were at imminent risk of harm in the care of their mother. The court also finds that Heather's actions, in her misguided attempts to protect her daughters from what she viewed as sexual abuse by their father, were in themselves a form of abuse and neglect of the children, although the court cannot find from a preponderance of the evidence that Heather W. intentionally sexually molested her daughters. The court finds that her repeated questioning of them, examining them herself and seeking out other professionals to examine them constituted emotional maltreatment of her children. The court sustains the previous temporary orders of the court and awards sole custody of the two minor children, Katherine and Alexandra W., to their father, John W.
The court further finds that placing sole custody of the children with CT Page 13287 their father is in the children's best interests. The court further orders pursuant to Connecticut General Statutes § 46b-11 that in the best interests of the children, this decision and all trial exhibits are confidential and not open for inspection by the public except upon order of the court. The court denies the claims of the intervening maternal grandparents. Penelope and William C. Detailed orders regarding access and further necessary therapeutic involvement follow at the conclusion of this decision.
1. The Sexual Abuse Allegations.
(a) Background:
The court could not more eloquently describe the general background of these matters than through the words used in a Superior Court decision:
 "Allegations of sexual abuse during a contested dissolution of marriage are of grave concern. They have substantial impact upon community services, the courts and the families involved. The claims color the existence of the principals, adults as well as the children and their lives.
 Investigators, evaluators and the courts respond with care and caution, fearful of erring and placing the vulnerable child in jeopardy. The normal principles of guilt in our constitutional society are often swept aside in an eagerness to protect the young. The claimed behavior is so abhorrent, harsh preliminary judgments are often made and incorporated into judgments and orders, all in the name of safeguarding the defenseless. The accused is a great parental risk. Evidence of wrongdoing results in severe orders. Often, even in the absence of evidence, the accused is treated harshly. Accusations so often change the balance of power in custodial disputes, that they become lethal weapons." Docket No. FA-90-027128S, Butler v. Butler, 1992 Ct. Sup. 1466 (1992).(Steinberg, J.)
Fortunately for John W. and his continued involvement with his daughters, he was not subject to "harsh preliminary orders," due in large measure both to the lack of evidence of his sexual abuse of his daughters and the professionals' conclusions. He was fortunate in the support his family provided to him. After the first allegations surfaced in May, 1999, either his sister or his mother were with him at all times when the CT Page 13288 children were in his care. They were always available to vouch for his conduct. He also testified that he never sat on the children's beds or bathed them after that time. In addition, his sister has been living in his home and sleeping outside the children's bedrooms up and through the time of trial. He took significant and extraordinary measures to protect himself from allegations that, if believed, would have inflicted even greater havoc on this family than they did.
Heather and John W. were married on July 24, 1993. On June 14, 1995, their oldest daughter Katherine was born. Over two years later on December 27, 1996, their second daughter, Alexandra was born. Both parties are well educated. Heather is a family nurse practitioner employed by St. Raphael's Hospital in the pediatric department. John is an attorney with a solo private practice located in Middlesex County. What is striking about their descriptions of their marital history is their frequent separations and the degree to which this couple failed to form a cohesive union and how each blamed the other for their marital conflicts and difficulties. As noted by Keith Roeder, the psychologist who performed a custody evaluation in the dissolution matter and whose evaluation and report is an integral part of the child protection case:
 "virtually none of their conflicts appear to have been resolved and consequently their marriage appeared to be destimed to fail from the start."[2]
Heather, as her testimony and the psychological evaluation would reveal, continues to be convinced that John made no meaningful parenting contributions to the raising of their daughters while they lived together as a couple. She believes that he has nothing to offer his daughters and has a fixed belief that he is mentally unbalanced, has sexually abused Katherine at least once and is a violent man. The court finds, from the evidence, that the inability of this couple to communicate with each other and to reach a mutual understanding about anything concerning their relationship or their children contributed to the deep-set and abiding distrust and animosity with which Heather views her former husband. The court also concludes that Heather is incapable, as a result of her strongly held beliefs, of viewing even the most innocuous acts of her former husband without seeing in them confirmation of that which she believes. Heather testified and clearly believes that she is at "war" with him. The court finds that the territory over which the war has been waged are the two children, much to the children's detriment.
Despite hearing the testimony that there have been no allegations of sexual abuse in the eight months that the children have been in the primary care of their father and despite receiving the various reports of the experts and other investigators and hearing their testimony at CT Page 13289 trial, Heather testified that she viewed John as a risk to the girls, an "emotional risk." When questioned further, she stated this conclusion was based on the fact in her mind that he is "not emotionally in tune with them." She characterized this as "a very big risk, a risk in their development." However, she does not seriously question her own competence as a parent, despite very negative conclusions and reports about her role in the sexual abuse allegations and subsequent investigations. She continues to perceive herself as the only person who is able to properly raise her daughters, with the exception of her parents, with whom she is very close.
It is with this background and in this context that her reports of statements made by Katherine and later on by Alexandra about their father must be placed and analyzed. Heather C. has claimed on numerous occasions that both children made statements to her that their father sexually abused them. As noted, none of these allegations were substantiated by any of the professionals who investigated the allegations.
At trial, Heather's position had changed dramatically from her earlier claims, as she testified that she had come to believe that only one of the allegations was true. This was the first allegation made to her by Katherine in May, 1999. She testified that, with the counseling she has received and because of her discussions with the experts as well as her review of the reports they prepared, she had come to this understanding. The court finds her testimony credible, although there remain many inconsistencies in how she views John W., if she believes only one event of abuse took place. Because Heather C. did not claim at trial that each of the reports and allegations she relayed in 1999 and January 2000 to the authorities were evidence of sexual abuse and because such reports were never substantiated, the court will not review each such report in detail.
(b) The First Sexual Abuse Allegation:
The first allegation claimed by Heather to have been made by Katherine took place on May 19, 1999. But well prior to that date, Heather had suspicions about John sexually abusing the children and had reviewed those suspicions with her counsel at the time as well as a psychologist whose advice she sought on March 16, 1999.[3] The court concludes from her notes that, whether or not she was aware of her intent, she was searching for facts to substantiate her beliefs more than two months before the first allegation came. Specifically, the court concludes that she was formulating a strategy for the "war" she was about to wage and in which she believed she found herself. She also observed in those notes and testified that she believes that John prefers Katherine to Alexandra and did not bond with Alexandra, based, among other things, on the fact CT Page 13290 that he slept in Katherine's room after Alexandra was born for some months.[4] This decision to sleep apart from her at that time seems to have angered her considerably, as the parties own sexual relationship was poor.
That first allegation of sexual abuse was made by Katherine on May 19, 1999. Heather's report of the conversation she had with Katherine that day is illustrative of the manner in which Heather dealt with all of the subsequent allegations. The conversation demonstrates the way in which she herself inserts John into the conversation at crucial points and makes assumptions about what the child is saying, which assumptions then cause her to act in ways that negatively impact the child. As Dr. Roeder noted in his evaluation:
 "Her questions reveal a process whereby Heather asks direct leading questions based on what she believes to be true. She then uses the children's response to validate her preconceived belief."[5]
The manner in which Heather responded to Katherine's behavior and statements illustrates this distorted process to which Dr. Roeder refers. Heather reports in her notes and testified that the children on that afternoon were to take naps. Alexandra fell asleep but Katherine had a difficult time settling down, so she lay on the bed with her. First Katherine kissed her on the lips a number of times. Heather told her not to kiss this many times on the lips. The notes continue:
 "K then turned on her back with her legs in a semi-frog position and put both thumbs in the crotch of her undies. (K. has never touched her genitals She's looked but has never been a child who touched herself) K then reached over and took H's arm between her legs and squeezed her legs tightly around it while then turning on her side. H asked innocently: "What are you doing?"
K: "I'm snuggling"
H: You're snuggling?"
K: "yes, It feels good."
H. "Do you snuggle like this with daddy?"
K: (nods head) (smiles) "yes." CT Page 13291
 H: "I know it feels good, sweetie, but these are your private parts and they are just for you to touch." (H removed arm while talking).
 K: (reached over and pulled H's arm back betw. her legs) "these are my private parts? (while pointing to her knees).
 H: "No, those are your legs these are your arms, but here are your private parts (pointing to the crotch) and it's only for Mommy or the doctor to look at them but that's really all." (H removed arm again)
K; "Well, Daddy then shoots up into the air?
H: "What?" (H smiling)'
 K: "Well, Daddy then shoots up into the air, high like a plane, flying to Mexico (K reached over pulled arm betw legs) "Then its like bubbly soaps suds." (K let go of H's arm and in the air moved her (illegible) around over the top surface (illegible) her trunk) "like a bath toy."
H: "Daddy's like soap suds?"
 K: "Yes, Daddy's like a bath toy."(emphasis added, not in original)[6]
Heather continues in her notes to observe:
 "H recalls also briefly saying to K that people who are married can be close and do special things together (around when H was talking about K's private parts). K responded that she didn't know who she was going to marry."[7]
Heather then observes that she transcribed this account from a piece of paper on which she had written the conversation ten minutes after it occurred. Next, Heather called her pediatrician's office and made an appointment to see the nurse practitioner, Janet Murphy, the next day. Heather had switched pediatricians at the commencement of the dissolution action two months earlier, choosing this practice on her counsel's recommendation and because Janet Murphy was associated with the Yale Child Sexual Abuse Clinic and knowledgeable about sexual abuse allegations.[8]
CT Page 13292
Janet Murphy testified at trial. She reported that on May 20, 1999, she met with Heather and Katherine in the pediatrician's office. She testified that Heather reported the events of May 19, 2000 to her. She spoke to Katherine about them and they "talked about who could touch her there." She stated:
 "I had first started talking about bath toys at Mom's house and the story they had talked about yesterday. I asked her what she meant by "daddy shoots up in the air.?" She stated "Daddy's fishy." It was not real clear what she meant. I questioned her about the shooting up.
Ms. Murphy went on to testify:
 "the interesting thing was that I thought about it later we were in our fish room and had fish pictures on the wall. When I asked her about the shooting up, she replied "watery" and Mom corrected her "you said soapy suds" and then Katie said "watery bubbly stuff." When I asked her where it is on Daddy, she replied: "it's on Daddy" and she gestured to the stomach area."
Ms. Murphy indicated that she did not file a report of suspected child abuse. She noted that it was a worrisome statement, but it was not clear what Katherine was talking about. She testified:
 "I did not feel it was abuse, there was a lot of difficulty going on in the family. We had talked about getting the children into therapy."
She noted that she spoke to the children's attorney, to the evaluators at the Yale Sexual Abuse Clinic and to the children's pediatrician. "Every one seemed to agree with me. If we had gotten some more statements that were suggestive of sexual abuse, then absolutely, we would have gone to DCF." She also noted that when Katherine was being questioned. her mother was in the room and Katherine was clingy. She did not feel that she would get anywhere with her without her mother present. She observed that Katherine was not yet four at the time. She also stated about the child's story "it did not feel like something that someone had coached her to say." She stated that her concern was "low level." When asked to clarify, she noted that at one level the "conversation was talking about a fish game in the bathtub. In terms of abuse, it could refer to masturbation activity going on. We did not have enough information to CT Page 13293 know for sure." She felt the child needed to process this in therapy and noted she was aware that the therapist, Diane Rotnem, later did discuss a fish game the child had referred to.
Heather could not accept this conclusion. She called the pediatrician's office a number of times to determine if a referral to DCF had been made. She then called DCF to report the incident on June 3, 1999. The DCF record of the conversation tracks the events previously described by Katherine to Heather. DCF had contact with the children's therapist, Diane Rotnem, who indicated she addressed the allegations in play therapy but that she could not support those allegations. Diane Rotnem, who also testified, stated that the children showed considerable sexual reactivity, which she believed could be indicative of sexual abuse. On June 30, 1999, when the investigation by the Yale Sexual Abuse Clinic was scheduled, DCF closed the case.
In addition, Heather wanted desperately to have John's visitation stopped, which the social worker told her would not happen. The DCF narrative of a follow-up phone call made on June 4, 1999[9] reflects the social worker's awareness of Heather's anger at being denied this request. The social worker noted that she informed Heather of the existing court order, which had been entered on May 24, 1999 after a hearing at which Janet Murphy testified. At that time, the court ordered that visitation was to continue unsupervised. (Higgins. J.) Heather did not mention her anger over visitation at this juncture in her own notes or during her testimony about these events. Her omission is glaring, given the events of the next day, June 4, 1999, and calls much of the accuracy of her notes and own perception of events into question.
On June 4, 1999, Heather and John were involved in an explosive visitation exchange, when Heather turned the children over to him for his visitation period. Heather's own testimony concerning the exchange was troubling to the court. She stated that she had been unable to say good-bye to the children, even though she had waited in her car for ten minutes for her husband to appear. Then, Heather brought Alexandra to John, who took the child to his car. John's mother then started to strap her in the front car seat. Then he came to get Katherine and placed her into the car seat in the back seat. Heather says she then went to John's car to say good bye and was prevented from doing so by her mother-in-law, who pushed her. Because the children were crying and upset as she had not been able to say good-bye to them, she states that she removed Alexandra from the car seat in John's car. She then went around to the other side of the car where Katherine was, opened the door and sat on the rear car floor and comforted both girls for about five minutes before she then left. The court was disturbed by this self-justifying testimony, since by her own admission, Heather had had more than ample CT Page 13294 time to say good bye before John arrived. Her parental obligation during this visitation exchange was to turn the children over with as little fuss as possible and leave. It should never have been about lengthy and, confirmed by her own testimony, confrontational good byes for two young children already torn between two parents who only recently lived in the same household. Even without the conflicting testimony from John, it reflects a mother who was emotionally deaf to the negative impact of her conduct and the dissolution process on her children.
John testified that, after he came to get Alexandra out of Heather's car and returned to get Katherine, Heather appeared without warning to snatch Alexandra back out of the car seat. He testified that she made angry statements to him in front of the children and that she pushed her mother-in-law into the car. Both girls were crying and upset. John testified Heather called him "a pervert" in front of Katherine and called her mother-in-law a "bitch." He testified that he had to separate his mother and his wife. He stated he stood by and waited until Heather got back out of the car to do anything further. When Heather appeared to be taking Alexander back with her to her own car, he told his mother to let it be and that he would deal with it through the attorneys. He confirmed that Heather then brought Alexandra back to his car and then he left with his daughters.
There is one additional piece of evidence that demonstrates without question Heather's extreme anger and the astounding degree of her aggression against John and his mother while in the presence of the children. For reasons never explained, Heather had a friend surreptitiously video tape the exchange.[10] Why she did not immediately destroy it upon viewing it is not clear. While the videotape is without sound, and her comments were not recorded, her actions are. Heather provided the tape, whose existence was unknown in the summer of 1999, to the psychologist evaluator as an example of John's violent actions. It clearly demonstrates the exact opposite of her claims, namely her violent actions as well as her significant distortion of the events she observed and participated in, even months after they happened and while being faced with documentation of what it is that actually took place. This distortion remains a very serious concern of the court in connection with her dealings with her children and is clarified further by Dr. Roeder's report and testimony concerning his evaluation. As noted by Dr. Roeder in his evaluation, the tape "revealed her own resistance to separation and her aggression. Heather giving me the tape dramatically underlines the fact that she is unaware of these issues herself."[11]
She remained completely unaware of her behavior and its destructive impact on her children at the time of trial. Her own testimony only serves to underscore and validate the accuracy of Dr. Roeder's observations and conclusions. CT Page 13295
(c)The other 1999 allegations:
The call concerning the May, 1999 allegation was not the only referral made by Heather to DCF. On July 21, 1999, she made another report to DCF regarding Katherine's disclosures to her. This referral concerning Katherine placing her fingers in her crotch and stating "this is where Daddy touches me." At that time, a sexual abuse evaluation of Katherine had been scheduled at the Yale Sexual Abuse Clinic and the case remained closed. The next report came on August 6, 1999, when Heather alleged that when Katherine's paternal grandfather had physically abused Katherine. Janet Murphy also contacted DCF as Heather had brought Katherine to see her.
The next several reports came from Detective McGlynn who was investigating the case based on the first allegations against John W. On September 13, 1999, the detective reported that John W. called to report sexual abuse of Katherine by her mother. He reported and John testified that Katherine woke during the night, began to cry and told him that her mother was touching her, pointing to her genitalia. Katherine stated to her father that her mother tells her: "This is where Daddy touches you." The next report was made by the detective on September 30, 1999. The report originated with Heather, saying that when she asked Katherine why she is constantly touching herself, Katherine reported that both her father and her paternal aunt touch her there, while telling her that her "mommy touches her there." None of the reports were substantiated by DCF. Because of the constant reports and cross-allegations,[12] the family court entered an order on August 9, 1999 that neither parent was to make any additional reports to DCF without prior notification to all counsel. On November 3, 1999, DCF determined that the various sexual abuse allegations were not substantiated.
(d) The Yale Child Sexual Abuse Clinic Evaluation:
After the first allegation, a referral was made for further investigation at the Yale Child Sexual Abuse Clinic. The children were seen there first on August 25, 1999 at which time they were physically examined. Dr. John Leventhal testified that he performed the exams and the findings were normal. The children were interviewed by a social worker at the clinic and the clinic determined that Alexandra was still too young to be evaluated. Katherine was interviewed by the social worker on five separate occasions starting on September 23, 1999 and ending on October 29, 1999. The parents were interviewed separately and cautioned not to ask Katherine direct leading questions about the alleged abuse.[13] On November 11, 1999, the team of Dr. Leventhal and Tracy Bombaci, the social worker, met with the parents again separately to CT Page 13296 discuss their findings and to provide feed back to them. On that date, Dr. Leventhal testified. he informed the parents that the clinic had concluded that there was no evidence that John W. had molested Katherine. The written report of the findings, which is dated November 15, 1999, noted in its conclusions:
 "However, there appears to be considerable confusion for Katie about touching of private parts. The only statements she made regarding touching related to the mother touching her and saying its dad. It is unclear the exact nature of this touching by mother that Katie described, but there is concern that this is another example of Katie's feeling of pressure related to her relationship with her parents in the midst of a custody battle. The nature of the touching may be related to the questioning and checking initiated by Mrs. W. regarding her concern that Katie is being sexually abused by her father."
The clinic recommended that these issues be dealt with in therapy for Katherine, which therapy was then ongoing with Diane Rotnem.
2. Other events in 1999
Both parents testified to the considerable other difficulties they and the children experienced in 1999. John testified about his difficulties in being able to visit with the children in the first month the parties separated, when Heather and the children lived with her parents and she would not permit them to be with John without supervision, due to her fear, as her logs note, that he would take them away from her. Despite the automatic orders, which enter in a dissolution case upon its filing, until the initial court hearing, no agreement, despite the involvement of all the professionals, could be reached. The court concludes from the testimony that Heather prevented the children from being able to see their father in a more normal way and herself set the acrimonious tone of the legal process during the following months in early March. She conveyed to her children by her actions in an unmistakable fashion her opinions of their father to the children. Her parents participated in permitting this to occur.
Both Heather and John have testified at length about the difficulties of telephone access to the children while in the care of the other parent. John's logs are full of the times of the calls and the frequency with which they were not answered. Heather's logs note similar activity although it did not appear to be as frequent as in John's case. Given the fact that Alexandra was not yet three and Katherine had just turned four CT Page 13297 in the summer of 1999, the court concludes that lengthy telephone conversations even in an intact family with an absent parent would not have been likely, given the children's interests and activities. The court finds that such telephone contact had more to do with the parents' needs for reassurance than with any needs of their children. Unfortunately, it was one more arena in which the "war" was fought with negative consequences for the children.
While the court could detail many other disputes that the parents had during this time, the general consequences of those disputes have already been noted. The disputes were about the day care choice, the times the children should be there, whether each parent could visit, dance lessons, when a parent could attend and who was where at what time and whose fault any mishaps were. It would be impossible to resolve those disputes at this late date, except to note that everything that took place was disputed and contested. The behavior and disputes, the court finds, were mostly instigated by Heather and resisted more passively by John. These separated parents interactions in 1999 presented a text-book case of a "high conflict" dissolution.
3. The Removal of the Children, the OTC and the Neglect Proceedings.
(a) The sexual abuse allegations of January, 2000.
Heather W., approximately two months after hearing the results of the Yale Child Sexual Abuse Clinic evaluation, made an appointment with a new pediatrician whom neither she nor the children knew in another area of the state. This was a substantive violation of an earlier family court order that there be no further referrals to DCF. Heather brought Alexandra to be examined on January 19, 2000, as she claimed Alexandra had made a disclosure to her of sexual abuse by John W. the day before. She testified that on January 18, 2000, she noticed that Alexandra's crotch area was red, when the child was returned to Heather from her time with her father. When Heather remarked about it, Heather claims Alexandra stated to her "Daddy touched me and licks me like a dog."[14]
Heather then consulted with her counsel and the appointment for Alexandra's examination was scheduled. Heather testified to the various reasons that she and her counsel determined to take this step. The court cannot find any of those reasons persuasive, in view of the existing family court case and orders. The court concludes that Heather circumvented the import and meaning of the existing court orders by taking Alexandra to be examined, even though she made no direct referral to DCF.[15] Whether or not she was counseled to do so by her attorney is not of concern to the court. She, as the parent and a nurse practitioner, must have known what the probable outcome of such a visit CT Page 13298 would be. She subjected Alexandra to an invasive medical procedure when there were other options available to her that would have been less detrimental to her youngest daughter.
Heather testified that she and her counsel determined that she would provide no background to the pediatrician, so that they would receive an independent assessment. Having had the opinions of DCF, Janet Murphy, Diane Rotnem as well as the Yale Child Sexual Abuse Clinic, the court concludes that Heather, at that time, was completely unwilling to accept the professionals' opinions that there was no evidence John was sexually abusing his daughters. She took this drastic step to confirm her own firmly held convictions despite contradictory expert opinions. With this step and by her own conduct Heather brought about the removal of her daughters from her direct care.
At the examination, the pediatrician, who also testified, noticed some discharge while examining Alexandra and therefore performed a full examination. Alexandra had just turned three years old and was very upset by this. When asked by the pediatrician where the "boo-boo" was, Alexandra made a different disclosure than the one she made to her mother earlier. She stated: "Daddy touched me with his fingers on my bottom and lifted my legs up and squooshed me like a pillow." When questioned, the pediatrician stated she believed that Alexandra mentioned that she was on the couch when touched, but she did not know further where the child was when the described event took place. The pediatrician stated that she made the referral to DCF that day. She further noted that Heather had provided no background or history to her and she was unaware of the dissolution proceedings, the sexual abuse allegations or evaluation and earlier DCF involvement. She indicated that this information would have been helpful to her.
(b) The DCF Investigation Prior to Removal
Based on the referral received on the evening of January 19, 2000, DCF began yet another investigation. Dorine Charamut, the social worker assigned to investigate, testified concerning her conduct of the investigation and her interviews of the children. She stated that the child protection matter was assigned to her on January 20, 2000, a Thursday, the day after the referral was received from the pediatrician. She testified that she reviewed the previous DCF history and attempted to speak to the pediatrician, but because she had a vacation day scheduled on Friday, she did not interview the children immediately, but scheduled that interview early the following week.[16] She attempted to schedule a joint interview with State Police, but was unable to do so. She stated that DCF received a copy of the Yale Child Sexual Abuse clinic report on January 26, and that she interviewed Katherine and Alexandra at Dr. CT Page 13299 Roeder's office on January 27, 2000. She testified that both children were avoidant, and Alexandra would not engage with her. She determined not to press the child further on that day and was not able to complete a substantive interview with her.
Next, she interviewed Katherine. During her interview of Katherine on that day, Katherine whispered in response to a question about whether any one touches her on her underwear; "mommy." The child then stated that her mother touches her with her hands. When asked whether her mother says anything when she touches her, Katherine stated "yes. she says this is daddy. Katherine stated `I say that's not daddy, mom says yes it is. I say no it's not.'"[17] The court concludes, from the testimony of Ms. Charamut, the record kept of the interview as well as the opinion of Dr. Roeder, that Ms. Charamut properly conducted this interview in an appropriate manner. Katherine's statement was consistent with earlier statements she had made to the investigator at the Yale Child Sexual Abuse clinic in the fall of 1999 and her statements to her father during those months.
Heather, in connection with these interviews, has raised the issue of brainwashing of the children by John. While Heather claims that the children should have been interviewed prior to returning them to their father, the court notes that several of Katherine's interviews at the Yale Child Sexual Abuse Clinic were conducted during the time the children were with her. Yet, the disclosures were the same. The original interview of Katherine in May, 1999 by Janet Murphy was conducted when the child was with her. Further, Dr. Roeder in his report and in his testimony addressed Heather's claim that Katherine was being brainwashed by John to say these things. In his report, he wrote:
 "Brainwashing and parental alienation are frequent occurrences in contested custody cases and therefore much is known about certain aspects of this process. The first is that the younger the child the more difficult the brainwashing task. This is because the child is developmentally and cognitively immature. Brainwashing doesn't usually take a consistent or long-term hold in a young child's memory. The second, and most significant aspect, relates to the child's proximity to the "brainwashing' parent. The further away from the `brainwasher' the less likely the child will express the brainwashed statements. Thus, the better the relationship with the parent being alienated the less likely the child is to express the "brainwashed' statements."[18]
CT Page 13300 He concludes by observing that "Katie has, for the most part, an excellent relationship with Heather and John was nowhere around when she told numerous people that Heather was touching her." He therefore finds that John did not tell her to say that Heather is touching her. The court concurs with this conclusion and does not find Heather's claims that John "brainwashed" Katherine persuasive.
(c) The 96-hour hold and Placement of the Children with their Father
DCF may, in order to implement its statutory obligation to protect children in this state. determine that their continued care in the home places them at imminent risk of harm. For a period of ninety-six hours, their decision is not ordinarily subject to court review. After that time, DCF must seek a judicial determination of probable cause, based on sworn documentation, and must also begin the neglect petition.[19] The hold was ordered by the DCF supervisor, Debra Collins, who also testified. It was invoked on the afternoon of January 25, 2000 at 4:10 p.m. Ms. Collins testified that she made the decision, based on her knowledge of the case. While she consulted both Dr. Roeder and the children's therapist whether placing the children in their father's care was appropriate, she did not request from them an opinion as to whether the children should be removed from their mother's care. Given the background of this case, Heather's repeated and intrusive examining and questioning of her children and her decision to take Alexandra for a sexual abuse medical evaluation, the information from the professionals, as well as the DCF interview in Dr. Roeder's office, she determined that this was the appropriate step to take. The court also finds that it was an appropriate action to protect the children. Permitting them to remain with their mother was contrary to their welfare at that time.
On January 27, 2000, the two state police detectives who had earlier been involved in the matter interviewed both Katherine and Alexandra. Dorine Charamut, the DCF social worker, was present at the interviews. Alexandra's statements were inconsistent and unclear. Katherine, however, confirmed what she had earlier told Ms. Charamut in Dr. Roeder's office. In addition, she reported additional details that:
 "her mother puts her hand in her underwear when she touches her and rubs back and forth with her hand. Katherine stated that it hurts because her mother rubs her too hard. Katherine stated that her mother, has touched her in this manner 10 times."[20]
The next day, the ex parte order of temporary custody was granted by the court. (Santos, J.) On February 7, 2000, a preliminary hearing was conducted and the matter assigned for a contested hearing at the Child CT Page 13301 Protection Session on February 9, 2000. The court has reviewed the transcript of the hearing of February 9, 2000 and the orders entered. (Rogers, J.) While there "was argument about the import of the orders and ruling, the court concludes that Heather waived her right to a fully contested hearing at that time. Much of the hearing was taken up with a motion to disqualify the attorney for the children, who had earlier been so appointed in the family case, and as such, was familiar with the background and history of the legal proceedings and the family. The court denied the motion and ordered the contested hearing on the order of temporary custody consolidated with the neglect proceedings. The court will therefor review the evidence presented at trial concerning the order of temporary custody.
(d) The Order of Temporary Custody.
The court is by statute required to find, in order to sustain the order of temporary custody, that at the time of the issuance of the order and continuing to the time of trial, the children are at imminent risk of physical danger if they remained in the care of their mother.[21] While the court has already reviewed much of the evidence in support of the order of temporary custody, more was presented at trial. In support of the order of temporary custody, the children's therapist Diane Rotnem prepared and signed an affidavit. Dr. Rotnem was requested to prepare an affidavit by DCF. In her affidavit, she details the conversations she had with Heather on January 18, just after the examination of Alexandra by Dr. Abdo. She noted that Heather called her to report to her after the children's return from their father's. Diane Rotnem testified that Heather "had once again become very concerned about the physical and emotional well-being of her children." Heather reported the disclosure the child had made to her the evening before and details the same justifications for taking the child to an unknown pediatrician that the court previously found unpersuasive. Heather said to Dr. Rotnem:
 "I know that John is sexually abusing my children and no one is willing to do anything about it. The girls come home sick and aggressive and regressed. I had to find a doctor who was not biased and who could do an objective evaluation. I KNOW when something is not right, I'm the mother. This man is a perpetrator of sexual abuse and none of the professionals want to see it. I KNOW this man."[22]
At the therapist's request, Heather brought Katherine to an appointment on 1/20/2000. During the course of the session, Katherine made a number of what the court would I characterize as her child's observations of the contentious process in which she was involved. While playing with figures CT Page 13302 in the dollhouse, the child stated "I still can't figure out who's nice and who's not nice." When questioned about whether daddy or mommy does bad things. she stated that her mother does. When asked what, Katherine replied "I don't know. Its like she has a feeling she doesn't care about me or dad." The conversation continues a while longer. The therapist notes that:
 "I think you are going to spend some of your days with mom and some of your days with dad. The judge is trying to figure that out with Dr. Roeder's help." Katherine then states: "When I'm at dad's I tell dad I don't want to go back to mom's. Then when I'm at mom's I tell mom that I don't want to go back to dad's." When asked why she did this, she said "because I don't want to hurt anybody's feelings."[23]
The affidavit also notes that Katherine disclosed to her therapist that her mother had been touching her. The child stated:
 "She's pretending my bottom is daddy and she touched my bottom." She touches me like this (demonstrating on unclothed baby doll by putting her finger in female baby's genital area) She touches me like this and says "is this what daddy does to you?. Its not good." Further in the session, the child reports: "It's real. She is the one who touches me. She pretends my bottom is daddy and touches me with her hands and says "yeah, yeah, yeah, you can't catch me." The therapist then asks her: "Does it hurt when she touches you by your privates?" Katherine replied; "Yes . . . . lots."[24]
Katherine denied that she had been touched by her father. Dr. Rotnem did not file a report of suspected abuse with DCF at the time of this disclosure as she testified because there was an ongoing investigation and others were making reports. She stated that this was not her" role or the focus of my sessions. I did not identify myself as investigating these allegations and knew other professionals were investigating this."[25]
On cross-examination, Dr. Rotnem admitted that there is some material in her notes that she did not transcribe in her affidavit. She stated that these notes were just rough working notes, to stimulate her memory about the sessions. She noted that she was not asked by DCF to prepare a complete treatment summary and a diagnostic analysis, which would have included more information. She stated as the children's therapist she did CT Page 13303 not believe on January 24, 2000, the children were at risk of imminent harm. She also testified that she did not believe that the children were then at risk of being sexually abused. She testified that "the harm to them was coming from the conflict in the family and the legal process."
Dr. Rotnem also appears not to have considered whether Heather was physically examining her children on a regular basis upon their return from their father's house. She stated she assumed that in January, Heather's awareness of how red Alexandra's bottom was came when she took her out of the bathtub. She testified" I do not know that she was checking them and I do not know that she was not." She stated the children never told her their father was sexually touching them in all of the therapy sessions, which began in May, 1999 and which where still ongoing, although less frequent at the time of the trial. She also noted that she was aware that Heather "really believes that Dad is a child molester and sexual abuser." She noted that "she had the sense that the mother has wanted me to tell them their dad is a bad man and is sexually abusing them." She noted that Heather's allegations about this were constant.
The court concludes that Dr. Rotnem was able to establish a reasonable therapeutic relationship with the children. Nevertheless, her demeanor and evasive answers to questions in the courtroom demonstrated that she is significantly ill at ease with any adult confrontation. The court also finds from the testimony that she at different times reported differing conclusions to each of the parents, depending on which of the parents she was speaking to. Her inability to be consistently candid added further confusion to the case. Her failure to confront the parents and the central issues with the children made her input less beneficial to the children than it could have been. As the children's clinical treating professional, on whom other professionals were relying for reports and conclusions, the court finds she was not only derelict in her statutory duty as a mandated reporter, but also failed to draw reasonable evaluative conclusions from the information and disclosures she was receiving. This made her involvement during the crucial conflicts in these children's lives less beneficial to them than it could or should have been.
The court concludes, from all of the evidence that DCF had in January, 2000 and all the evidence that has been presented, that at the time of the OTC the children were at imminent risk of harm from their mother's uncontrolled behavior in pursuing her vendetta against John. Her untrammeled pursuit of this end ignored the children's need to have a relationship with their father and the importance of that relationship to them. Her willingness to subject them to repeated examinations and questioning by professionals was also harmful to them. CT Page 13304
(e) Events since the OTC until the time of Trial.
At the time of the order of temporary custody, the court, in order to facilitate the return of the children to their mother, entered orders of specific steps. Heather, apparently not understanding the legal significance of these steps, did not comply with these court orders and still has not fully complied. Those steps required her to follow the recommendations of any evaluations, including the evaluation of Dr. Roeder, which her testimony made plain she did not complete. Specifically, she did not seek to initiate the type of individual therapy that he had recommended for her.
Regardless of their mother's compliance with court orders, the enforced separation from their mother and the resulting lessening of the conflict between the parents has had a positive impact on the children. Dr. Rotnem reported that she last saw Katherine and Alexandra on June 22 when she testified at trial. She noted that the children "looked great" and that she "did not observe any signs of emotional distress." She noted that they seemed to be feeling very secure. The court heard the testimony of the children's day care providers who reported they were doing well in their day care. Dr. Roeder interviewed the children and found by March, 2000 that:
 ". . . they both appeared to be exceptionally well adjusted and emotionally healthy. They generally seemed happy, outgoing and friendly. Each invested appropriate energy and interest in all the activities. The girls' play themes, verbalizations, motor abilities, speech and language skills and social skills were all at age appropriate developmental level or above. In none of my interviews did the children display any behavior reflective of emotional distress. They were both consistently full of life and delightful."[26]
John testified that they have done well in the months since he has been their primary provider and they seem happy. In his opinion, their upsetting behaviors have lessened and they have become better adjusted.
In the summer, fall and winter of 1999, Dr. Rotnem found that both children were exhibiting emotional distress and noted their sexualized behavior. Tracy Bombaci of the Yale Child Sexual Abuse Clinic found that Katie appeared troubled and confused and was feeling CT Page 13305 pressure concerning her parents situation. Both parents' logs during this time are full of reports of the children's oppositional behavior, their separation anxieties, their difficulty sleeping as well as their nightmares. Dr. Roeder noted these facts and found that:
 "Since the effect of severe parental conflict in divorcing families almost always leads to distress in children, these corroborating observations probably reflect the girls true emotional and behavioral states over the past year."[27]
The court finds from the evidence that both children were exhibiting signs of distress in 1999 and the early part of 2000, but those signs have lessened as the year 2000 wore on. The most striking fact since their removal from their mother is that there have been no further sexual abuse allegations made by the children. Their life, as a result, has been free from further intrusion by adult investigators and examiners.
Since the order of temporary custody was granted, the children have had supervised and limited contact with their mother. Even with such supervision and despite the admonition that she not discuss the present proceedings with her children, Heather continued to pursue her "war" and recorded her actions in her notes on February 24, 2000. While the DCF worker was otherwise occupied, she reports that she asked Katie:
 if she understood why she was not seeing me, she said no. I told her that I knew lots of people asked her lots of questions + that she told them that Mommy does bad things so that they all think Mommy does do bad things. I told her that "I know that Daddy told her to say all those things but that I wasn't angry at her because she knows in her heart that Mommy would never do anything to hurt her." I said "it made me sad that her not telling the truth now doesn't let me be with her but Mommy's working on trying to change that."[28]
The court finds, on that date, despite the findings of the Yale Clinic, the DCF investigation, the contents of the OTC allegations and her sessions with Dr. Roeder, Heather was still completely unwilling to obey court orders and DCF instructions. She did not understand and could not accept that she no longer was permitted to be the sole arbiter of what was best for her daughter. It never crossed her mind that she should not suggest to Katie that Katie was not telling the truth (as the child understood it). that Katie is to blame for their being apart and that CT Page 13306 John is forcing her to say things that she does not mean to say. The court concludes, as Dr. Roeder observed in his report, that Heather's behavior "created significant problems for the children in areas of trust and safety."
(f) The Psychological Evaluation
The court has previously made ample reference to the psychological evaluation performed by Keith Roeder, Psy. D., of Hiebel and Roeder Family and Child Associates. Dr. Roeder performed an extensive, sensitive and thorough investigation and prepared a detailed reported completed in March, 2000. He suspended his evaluation from August 1999 to December 1999, so that the Yale Child Sexual Abuse Clinic evaluation could be completed. He testified that he did not believe that Katherine should be subjected to two evaluations at the same time. Although Dr. Roeder did not listen to the testimony of the witnesses as the court did, but only received the parties' reports concerning the various events in their married life together, his conclusions without fail coincide with those of the court who had the opportunity to hear the many witnesses and observe their demeanor in court, as well as to review the many exhibits.
(i) Heather's Claims of John's Violence
One of Heather's claims throughout has been that John subjected her to domestic violence and that he is a violent man who is therefore dangerous to her and their two daughters. The court heard considerable testimony concerning events, which Heather claimed demonstrated how violent John was. One was an event which occurred before the birth of Katherine, one when she was three months old, one when Katherine was nine months old and a fight in the car around the time the present dissolution action began in 1999. While these events as detailed were no doubt distressing to Heather, as they would be to anyone in an intimate relationship, the court does not find they support her claims concerning John's violence. The court cannot find that they were particularly or unusually threatening. In addition, the events were far apart in time and do not demonstrate a continuing daily abusive pattern of conduct. What was demonstrated by the testimony, however, is that Heather harbored injured feelings about these events for years without ever considering her part in the considerable unresolved marital conflicts between herself and her former husband. As Dr. Roeder noted in his report:
 "in considering Heather's image of John, I have formed the impression that her views stem largely from misperception, misinterpretation and exaggeration."[29]
The court concurs and finds that Heather's fears and claims are CT Page 13307 exaggerated.
(ii) Heather's claims of John's Lying
Heather has consistently challenged the validity of Dr. Roeder's evaluation by insisting that John lied in the forms that he submitted to Dr. Roeder. Specifically each of the parents completed a questionnaire called the "Multi Modal Life History Inventory." On John's form, Heather claimed he lied about never drinking coffee, about never taking tranquilizers and did not report a medical condition called "sprew". John's own testimony was that he did not drink coffee, however in a social setting when he was given a cup, he would sip a little before setting the cup down. He indicated, when questioned. that in connection with back surgery he had, he took a prescription medication that he understood to be a muscle relaxant as prescribed for him. Apparently this medication can also be prescribed as a tranquilizer. Heather claimed that he also had a medical condition known as "sprew," which he denied. The testimony concerning these matters consumed considerable trial time and is indicative of the intractable nature and depth of Heather's criticisms of her former husband. The trivial and misperceived nature of these complaints and the degree of venom exhibited in pursuing them without consideration as to their overall impact say more about Heather than about John's truthfulness. In fact, the court credits John's testimony on all of these points and finds that Heather's concerns only validate Dr. Roeder's conclusions as to her "misinterpretation, misperception and exaggeration."
(iii) Heather's Paranoid State
In his report as well as during his testimony, Dr. Roeder concluded that:
 "Heather's denials, projections, exaggerations, and misinterpretations lead me to the conclusion that she has a specific paranoid state[30] regarding John. This means that she is exhibiting a severe emotional disturbance in a very specific way. Regarding John, Heather's thoughts and perceptions are out of touch with reality."[31] (emphasis added).
He notes that in other areas of her life, she exhibits rational behavior and this behavior explains why her family and friends see her as so well adjusted. Nonetheless he also notes and the court finds that: "Heather's paranoid state explains her thoughts about John's dangerousness and her idea that only she can protect the children."
Heather's loss of daily contact with Katherine and Alexandra W., the CT Page 13308 court finds, was caused by Heather's own conduct, her unwillingness to be guided by professionals and her absolute blindness to what the court concludes was her poisonous impact on her own children. Given her conduct and her stated positions to date, the court expects that this memorandum of decision is not likely to cause much change in Heather's behavior, even now that she has had the opportunity to fully air all of her claims. While her testimony indicates that she has a small glimmer of understanding of her contributions to the "war" that she has declared, the court concludes that Heather has not yet proclaimed a "cease-fire," a step she must now take for the best interests of her children.
(iv) Heather's relationship to her daughters
Despite the criticisms of Heather' conduct leveled by the various professionals and this court, Heather, in general, has had a good relationship with her daughters. All reporters note, as did Dr. Roeder, that Heather is a "loving, caring and appropriately involved mother the children displayed comfortable love and affection for Heather." This gives the court some hope for Heather and her daughters in the future. Certainly her children have demonstrated their resilience in the face of the tremendous parental conflict that they have witnessed. Unfortunately, the court concludes that Heather's love and care for her children has not yet permitted her to overcome what Dr. Roeder called her "two glaring weaknesses." Those were the intrusive and suggestive questioning of the children, which continued even past the DCF removal of her children. The second is her refusal to acknowledge the importance of their father to these girls. That refusal, as previously detailed, was evident at trial, when she was still unable to acknowledge or understand that he had any significant role to play in their lives.
(g) Report and Testimony of G. Preston Wiles, M.D.
Dr. Wiles, a board-certified psychiatrist and child psychiatrist, reviewed and critiqued Dr. Roeder's evaluation of the family. Unlike Dr. Roeder, he did not have the benefit of any clinical interviews or contact with any of the parties. While his views were of interest to the court, ultimately his conclusions and opinions were unpersuasive, in part due to his inability to have any direct clinical contact with the family. In addition, he himself was unwilling to give any opinion regarding a preferred custodial placement because of that lack of clinical contact. His own credibility was also undermined by some of the steps he failed to take in his paper review of this difficult matter. His observations about the manner in which a child like Katherine may, because of her age and developmental status, come to take sides in the conflict between her parents was instructive, but of limited assistance to the court. The court finds, from all the evidence, that Dr. Roeder's recommendation that sole CT Page 13309 custody be awarded to John W. persuasive. The court reaches this conclusion from all the testimony in the trial supporting Dr. Roeder's conclusions and based on the court's own assessment of the credibility and demeanor of the various witnesses, in particular Heather C. and John W.
(h) John W.
The bulk of this opinion has been devoted to a review of Heather's actions. with only occasional mention of John W. This is of necessity so because it is Heather's actions and accusations which have driven the legal processes to date and which require detailed analysis. Nonetheless, John W. is also a critical participant in these matters. Dr. Roeder does conclude that some of John's personality characteristics have played into the difficulties in the marriage and into Heather's misperceptions of him. He found that John is "fairly rigid and emotionally over-controlled." He concluded that John's behavior could be viewed as falling in the area of "obsessive and compulsive character traits, but he concluded that John, unlike Heather, was not emotionally disturbed." He found that he "relies in reason and logic at the expense of feeling and intuition."[32] Nonetheless, he concluded, that despite John's difficulties, he "loves his children and he is quite capable of caring appropriately for them. He also seems to appreciate the importance of their having a relationship with Heather." He recommends sole custody of the children to John, not by default, but because he concludes, as does the court, that at present, Heather and John cannot co-parent.
The court finds from the evidence that John has always had significant parental involvement with his children, caring for them while their mother worked. While Heather disputes the level of that involvement, the court finds from the evidence that John has been an important part of his daughter's lives during the course of the marriage and the parties' separations. Indeed, Heather relied upon him to care for them when she worked on weekends and at other times. While she may have provided more of the children's care in terms of hours spent, John's contributions were sustained, considerable and significant. The court finds that he has cared for them appropriately in the months since the order of temporary custody was granted and their lives have improved since that time. He has undertaken the therapeutic steps Dr. Roeder recommended. He has obeyed the court orders. As a result, his daughters lives have been stable and without significant emotional turmoil since late January, 2000.
4. Neglect Adjudication
In carefully examining the question of whether or not Heather, as opposed to John. has sexually abused Katherine and Alexander by repeatedly CT Page 13310 examining them and questioning them. Dr. Roeder noted in his testimony the difficulty in interviewing children as young as Katherine and Alexandra. "Given their ages, it is difficult to judge if their verbalizations reflect the truth. They did not appear at any time to misrepresent the truth to me." He concluded in his report that:
 "Heather's behavior has to be connected to what Katie is reporting. She definitely planted the idea in Katie that she believed John was touching her. How far did she go in trying to have Katie verify her belief?"
In his opinion, the answer to that question lies in the overall context with which the allegations have been made. He concludes that: "Heather has attempted to alienate the children from John because of her intense rage towards him." The report also finds that "she has suggested to the children by words and behavior that their father is neither a good man nor a good father. In doing so she has created significant problems for the children in areas of trust and safety."
Her inability to understand what impact she had on the children and their feelings for their father was further demonstrated by her own testimony. She remained convinced that the children had no idea how she felt about their father. Such a claim, in view of the overwhelming evidence to the contrary, strains all credulity. Among some of the more obvious facts is her refusal, prior to the first court appearance, to permit the children to see their father, except in her presence and at her parents' home, during March, 1999. That behavior alone would make any child aware of her feelings. The court also finds that at the June, 1999 visitation exchange. which was videotaped, she made hostile statements to John in front of the children. Even if she had made no statements, her conduct that day without more would be traumatic for the average child, never mind children who are bright, intelligent and emotionally, as all who know them find Katherine and Alexandra. Her logs are full of repeated examples of her inability to establish boundaries between herself and her children, to have any empathy for their situation or to understand that they love their father as well as their mother.
On the crucial question about whether or not Heather sexually abused her two daughters by her repeated questioning and examination and told Katherine, as Katherine has repeatedly stated she did, that Daddy was doing this, the evidence is inconclusive. Dr. Roeder concludes that she has "attempted to alienate the children from John because of her intense rage towards him." The court credits this conclusion. Despite these conclusions, the court cannot find, by a preponderance of the evidence, given Katherine and Alexandra's age, the difficulties in interviewing such young children as well as the opinions of the various CT Page 13311 investigators, that Heather intentionally sexually touched her daughter Katherine and told her: "this is daddy touching you." The court cannot infer such hurtful intentional acts from a young child's verbal reports.
The court previously found that the emotional context in which the initial allegations took place was suspect for many reasons. Further, the court is aware that children are not simply miniature adults and that their parents' exhortations "to tell the truth" do not produce cause-and-effect logically connected factual reports of events in children's lives, despite what parents might hope. Katherine's statements, the court finds, cannot be taken literally as her mother always did. The court does find that the statements certainly reflect Katherine's inner reality, as she has correctly perceived with significant acuity, that her mother wishes her to say, "daddy did it."[33]
The court holds that the emotional abuse and neglect of these two children was caused by Heather's hatred of John and the significant negative consequence of that hatred to her children. Her blindness to the corrosive impact of that hatred on her own life and her daughters after all of the input she has received from other professionals is staggering. It is for these reasons that the court finds that the neglect petitions have been proven in that the children have been permitted to live under conditions injurious to their well-being and that they have been emotionally abused by their mother. The court therefore adjudicates both Katherine and Alexandra W. neglected children.
4. Best interests of the Children
Having adjudicated Katherine and Alexandra neglected children, the court must then turn, in the neglect context as well as in the context of the parents' competing custody claims. to what is in the best interests of the children. Our Supreme court has noted that the trial court:
 "first adjudicates whether there is neglect. Only when a finding of neglect is made does the court move on to the dispositional phase of the neglect petition. Disposition in a neglect petition may take one of a number of forms. including return to parent, return to parents with a protective order . . . . . . ." In re Juvenile Appeal (84-AB), 192 Conn. 254, 261, 446 A.2d 808, (1984). (Internal citations omitted.)
"At the dispositional hearing, the emphasis appropriately shifts from the conduct of the parent to the best interest of the child." In re RomanceM., 229 Conn. 345, 357, 641 A.2d 378 (1997). CT Page 13312
In these matters, DCF is not seeking a commitment of the children, but that sole custody be confirmed in John W. This is the relief that John is seeking and Heather is opposing in the family matter. In that context, out courts have noted:
 "The award of custody requires the trial court to make difficult and sensitive inquiries into the relationships between adults and children. In the search for an appropriate custodial placement, the primary focus of the court is the best interests of the child, the child's interest in sustained growth, development, well-being, and in the continuity and stability of its environment." Cappetta v. Cappetta, 196 Conn. 10, 16, 490 A.2d 996 (1985).
A. The Claims of the Maternal Grandparents
In considering the evidence concerning the children's best interests, the court must first review the claims made by William and Penelope C., the maternal grandparents of the girls. The grandparents were permitted to intervene and to present their claims for custody of the children. The court finds from the evidence that Katherine and Alexandra have a loving relationship with their grandparents, with whom they have spent considerable time in their short lives. Theirs is a supportive and loving extended family with aunts and uncles and many cousins of all ages who come together each year not only at the grandparents home but at their beach cottage in the town in which the children have resided. It is clear that if neither of the parents were available to care for the two girls, their maternal grandparents would provide an excellent home for them.
However, as set forth in Connecticut General Statutes Sec. 46b-56b:
 "Presumption re best interest of child to be in custody of parent.
 In any dispute as to the custody of a minor child involving a parent and a nonparent, there shall be a presumption that it is in the best interest of the child to be in the custody of the parent, which presumption may be rebutted by showing that it would be detrimental to the child to permit the parent to have custody."
Where, as in these matters, there is a parent who is able to care for the children and whose care for the children is not detrimental to their best CT Page 13313 interests, the statutory presumption makes it clear where their placement should be, no matter that the maternal grandparents would be appropriate under other circumstances.
While Heather offered much testimony that John is detrimental to the children, the court does not credit those claims as has been detailed above. The court concludes that John not only has but also continues to be capable of providing loving care and nurturing for his children. In fact, the children have prospered in his care in the months since they have had only limited supervised contact with their mother. It is for those reasons that the court denies the maternal grandparents claims.
B. The Competing Parental Custody Claims
The court's opinion concerning Heather's care of her children in the past year in the contentious and highly conflicted dissolution has been stated throughout this opinion and need not be repeated further. But a determination of what is in the best interest of the children includes many things, among them the need for Katherine and Alexandra. despite everything, to see and spend time with both parents. That right has been severely restricted for Heather since January, 2000. The court has noted that in other areas of her life, Heather functions well. She is, the court finds, with the glaring exception of issues concerning John. attuned to her children's needs and able to provide them emotional support.
John, on the other hand, is able not only to care for them and nurture them, he is also aware of his daughters' needs to have a relationship with their mother. See Savage v. Savage, 25 Conn. App. 693, 596 A.2d 23
(1991). He supports increased visitation of the children with their mother. The court finds that John is more likely than Heather to consider the other parent's opinion. John requests sole custody of the two girls and this claim is supported both by counsel for the children and the recommendations of Dr. Roeder.
Heather believes that she and John can co-parent and share joint custody of their children. She urges the court to consider this option, while also retaining the belief that the presence of John in their lives does not offer the children anything of value. In an ideal world, the court would like to believe this co-parenting was possible, as, all things being equal, it would be best for the children. But in this high conflict dissolution matter and its aftermath, all things are not equal. The most recent year and a half has amply demonstrated why these parents cannot co-parent.
 "Under Connecticut law, the trial court's discretion CT Page 13314 as to custody and visitation is not limited [to adopting the specific custodial arrangement sought by one of the parties]. It has long been established that the court has an independent duty to inquire into custody arrangements even when the parties are in agreement . . . Further, it has been recognized that in contested custody proceedings, the interest of one or both of the parents may be adverse to the best interests of the child. (Citations omitted) Fiddlemon v. Redmon, 37 Conn. App. 397, 403-403, 656 A.2d 234
(1995).
The court concludes in this case that Heather's plan is most definitely not in the best interests of her children. The court concludes, from all the evidence, that joint custody is not possible, given the level of animosity Heather has for John and the damaging consequences of that animosity. The court reaches these conclusions because it has had "the opportunity to view the parties first hand and to assess the circumstances . . . ." in which such personal factors as the demeanor and attitude of the parents are so significant. Leo v. Leo, 197 Conn. 1, 4, 495 A.2d 704
(1985). See also Weinstein v. Weinstein, 18 Conn. App. 622, 625,561 A.2d 443 (1989). The court concludes that the children's best interests are best served by an award of sole custody to their father, John W. The court finds that he is suitable and worthy to have custody of the children.[34]
All parties believe the children should have more access time to Heather than two supervised hours a week. In view of the girls' feelings for their mother and their attachment to both parents, the court agrees. Both parties concur that the children should have supportive counseling, although all, including counsel for the children, are in agreement that Diane Rotnem should not continue in that capacity. In view of the court's conclusions about Dr. Rotnem's role in this case, the court agrees. The court finds from the evidence that the best blueprint for normalization of the relationship between the children and their mother, while dealing with the need to monitor Heather's behavior, is the plan put forward by Keith Roeder in his custody evaluation. The court attaches a copy of his recommendations as Appendix A attached hereto and made a part hereof.
Dr. Roeder's plan calls for each parent to have individual treatment. John has begun such treatment. Heather has chosen a counselor without taking his recommendations into account, but needs to do so soon, if she is to have increased contact with her children. Further, the counselor chosen for the children should have the ability to deal with and assist the parents along the road to a more normal custody and visitation schedule. The court notes that the plan relies upon Heather's willingness CT Page 13315 to engage in meaningful therapy to address her emotional disturbance. The court remains positive as to the probable outcome, as the court does not doubt Heather's desire to be with her children. Nonetheless, if Heather does not engage in the necessary therapy, the consequences can only be extremely limited access to her children. in view of her past behavior.
The court's specific orders follow.
 THE COURT ORDERS
1. Sole custody of the minor children, Katherine and Alexandra, to their father, John W. It is so ordered pursuant to Connecticut General Statutes § 46b-56 as well as Connecticut General Statutes § 46b-129.
2. Supervised visitation between the children and their mother for one and one-half hours twice a week for the first two weeks as arranged and observed by the children's therapist and thereafter three times a week, as has been recommended by Dr. Roeder. This shall be the minimum visitation permitted and John should consider additional visitation and supervisors as may be recommended by the children's therapist. The court further suggests that a holiday schedule be formulated, when more input is available from the children's therapist. At this point in time, given the significant concerns about Heather's ability to conform her behavior to court orders and professional recommendations, the court does not enter any further access orders.
3. John shall immediately make arrangements for the children to receive counseling with a therapist who possesses the qualifications and willingness to facilitate the normalization process recommended by Dr Roeder. The court orders that as sole custodian, John is the parent in control of such counseling. However, for the counseling to achieve its purpose, Heather is permitted to speak with the children's therapist as requested and initiated by that therapist. To the extent possible, Heather and John shall not use the therapist to mediate any future disputes, but permit that professional to work in the best interests of their children.
4. Heather shall attend joint counseling sessions with her children, either separately or together, for purposes of improving her relationship with her children. The parties shall sign releases so that the counselor can communicate with and give written information to the children's attorney and to the parents on a regular basis, so that each will have the same information. CT Page 13316
5. The court recommends that Heather secure the individual counseling recommended by Dr. Roeder with a therapist who will be confrontive, firm and supportive. The court notes that Heather has not taken this step to date. The court further recommends. but does not order. that Heather sign releases so that her therapist may speak directly with the children's therapist to facilitate the normalization of the visitation access contemplated. Without such free communication, the process Dr. Roeder envisioned and which the court specifically approves is not likely to be effective. Further, the court recommends that Heather provide her voluminous notes to the therapist to assist the therapist in the task ahead.
6. The court further recommends that John consider separate access between the maternal grandparents and the minor children. The court accepts as reasonable, however, the suggestion of counsel for the minor children, that initiating visitation with the grandparents immediately while the considerable therapeutic work necessary to normalize their relationship is beginning, may not be appropriate. The court recommends, but does not order, that this matter be reviewed with the children's' therapist during the normalization process.
7. The court orders that the following be provided to the therapist for any of the parties and for the children: Dr. Roeder's full report as well as the court's opinion. Such materials may be disclosed to these providers without the need to seek further court approval for their release.
8. The court enters no specific orders re telephone access for Heather in view of the lengthy and protracted disputes about the efficacy of the previous court orders. The court recommends to John, as the sole custodian, that he be guided by the best interests of his children and by the suggestions of their therapist with respect to such access.
9. The court orders that Heather C. pay the interim pendente lite amount of child support shown on the first child support worksheet submitted by John W. in the amount of $183.00 per week together with thirty-eight percent of the work-related day care expenses. This order, subject to adjustment after the financial hearing to be held, is retroactive to March 9. 2000 and there is an arrearage, also subject to adjustment of $4,351.00. The court orders an interim payment of $27.00 per week on the arrearage.
10. In the event an appeal is taken from this decision, these orders also stand as interim orders. Yontef v. Yontef 185 Conn. 275, 293-294, CT Page 13317 440 A.2d 899 (1981).
11. The court will retain jurisdiction of this matter for a period of six months. During that time, the court is optimistic that with professional assistance, the parties can formulate a reasonable access schedule between Heather and the children. The court also orders the parties, prior to any contested court hearing on the issues of access within this time period, to submit to the mediation that Dr. Roeder recommends. The court cautions Heather that, for this plan to work, she must commit to considerable difficult therapeutic work with her individual therapist as well as with the children's therapist. Frequent trips to court over minor, temporary visitation matters are neither in her best interests nor in the best interest of the children. Had she earlier committed to that work in a serious fashion. she had it within her own power, without resort to lengthy and expensive court proceedings, to secure more contact with her children.
Barbara M. Quinn, Presiding Judge Child Protection Session
 APPENDIX A RECOMMENDATIONS OF KEITH ROEDER, Psy. D.
1) Heather to begin immediate individual treatment. Heather's denial and projection will make her treatment exceptionally difficult as will the "support" of her family. Heather's emotional disturbance is focused on John. In other areas she shows appropriate judgement, accurate reality testing, emotional stability and rational thinking. This is why she is so supported by her family and friends. She is not disturbed in her interactions with them and unfortunately they will reinforce her denial. Heather does not see her emotional disturbance. She openly gave me all of the material containing her beliefs and opinions because she thinks she is right and that everyone else is wrong.
 Heather's therapist will have to be confrontive, firm, and supportive. Therefore, the therapist will have to be very experienced and carefully selected.
2) John should also begin individual treatment. He, like Heather, is blind to his difficulties. He needs to become more emotionally expressive, more sensitive and less controlling.
3) Both Katie and Lexi need to continue in supportive therapy. They CT Page 13318 are faced with the destructive presence of severe parental conflict and parental alienation. They will need considerable help in coping with the damaging effects of these issues in their lives.
4) Heather's visitation to continue to be supervised and monitored even more closely. It should also be expanded. The children love and miss Heather. They have told me that they want to see more of their mother. It is potentially in their best interests to have more time and more frequent visits. I recommend that the visits be expanded to one and one-half hours each and that there be three visits per week. However I also recommend increased monitoring of Heather's behavior on visits. In her logs she documented her continued inappropriate questioning of Katie. She asked her if Daddy told her to say "those bad things" (Katie said "yes".) In her visit Heather has also degraded John to the children and displayed obvious anger towards him. These behaviors undermine the children's trust in both parents and will create internal distress in the girls.
 Further visitation changes should depend on Heather's ability to modify her behavior on the visits and upon her progress in treatment.
5) If there is sufficient progress in Heather's treatment, Heather and John need to employ a psychotherapist/mediator to help them devise a co-parenting plan. Through this process there may come a time where custody could be shared and visitation evolve to a normalized state.