[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION RE: NEGLECT DISPOSITIONAL HEARING
Introduction
As the result of investigations conducted by certain law enforcement agencies and the Department of Children and Families (DCF) during 2001, the above named minor children were taken into custody on 96 hour holds and/or orders of temporary custody (OTC) at various times in the months of July and August, 2001. Tatiana J. (Tatiana) was taken from the custody of her maternal aunt, Vicki M. (Vicki), while the remaining children were removed from the custody of their maternal grandmother, Wanda J. (Wanda). It was alleged that two of the children, LaToya M. (LaToya) Tatiana J., had been subjected to sexual abuse at the hands of an adult male, Philip G. (Philip), and that this abuse had been facilitated by an adult female, Guitana J. (Guitana).
Before proceeding further, a chart to show the relations of the various children and parties would be helpful. This will be attached as an appendix.
As the investigation continued, Guitana admitted to law enforcement officials that she took Tatiana to an adult male, Philip, for the purpose of allowing Philip to sexually abuse and exploit Tatiana. In return, Guitana received money. The investigation also disclosed that Guitana had taken her niece, LaToya, to Philip for purpose of sexual abuse and exploitation. Subsequently, Guitana, in both State and Federal court, admitted to having committed these acts.
On October 2, 2001, counsel for Wanda filed motions to intervene in this litigation on behalf of the six children listed as parties. The same counsel also filed a motion to intervene on behalf of Vicki concerning Tatiana. By the day of the hearing before the court (Reynolds, J.), November 13, 2001, his representation had apparently expanded to include Vicki and Shanaar J. (Shanaar), the maternal aunt and uncle CT Page 14453 respectively. After the hearing, the Court allowed only Wanda and Vicki to intervene in the dispositional phase only. This intervention did not include either the right to court appointed counsel or the right to appeal.
On June 13, 2002, before the court (Reynolds, J.), by telephone, Guitana entered written pleas of nolo contendere as to the neglect and uncared for counts concerning her children Telondia J. (Telondia), Tatiana, Jaylen J. (Jaylen). On the same date and before the same court, Nannette M. (Nannette) entered written pleas of nob contendere as to two counts of neglect concerning each of her children, Vintia M., also mentioned as Vinitia M. (Vintia,), LaToya McKale M. (McKale). The court adjudicated all six children neglected and/or uncared for and set the dispositional phase down for trial commencing on September 24, 2002. The court also entered defaults as to Chester B., putative father of Vintia, and Lemuel W., putative father of McKale.
On the above date, trial began before this court and was completed on September 27, 2002. Prior to the commencement of trial, counsel for Philip indicted that his client, who was being held in Federal custody at an undetermined location, had indicated that he did not wish to participate in these proceedings and was waiving his right to be present. The court finds that he has stood silent in these proceedings.
The trial commenced without the presence of Lemuel W. He arrived on the morning of September 26, 2002, wanting to participate in the proceeding. The Assistant Attorney General (AAG) and the attorney for Vinitia, LaToya McKale both objected to his presence, citing confidentiality and the fact that Lemuel W. failed to cooperate in paternity testing for McKale. Lemuel W. was excluded from the trial. Vicki and Chester B. also did not appear at the trial.
Both Nannette and Guitana left the trial prior to the conclusion of evidence.
In this case, the various parties have different wishes and desires. DCF is seeking the commitment of the children to its custody until further order of the court. The guardians at litem for the children indicated their belief that the best interest of the children lay in committing them to the custody of DCF.
Counsel for the children indicated that Vintia, McKale, and Telondia wished to return to the custody of Wanda, while LaToya and Tatiana did not wish to return there. Counsel for Telondia indicated that she strongly wished to return to Wanda, while Tatiana wanted no contact with CT Page 14454 her family. According to counsel, Jaylen likes his present foster placement and wished to stay there for the time being. He did not wish to return to Wanda at this time, but indicated that he might want to be reunited with her at sometime in the future.
The interveners' position was that the children should be returned to Wanda, but qualified it by indicating in final argument that at least Vintia, McKale, Telondia, and Jaylen should be returned to the custody of Wanda.
Counsel for LaToya indicated that she did not wish to return to Wanda and was frightened of the prospect.
Both Telondia and Jaylen submitted material through counsel that they wished the court to review prior to making its decision. Telondia submitted a one page letter dated Sept. 19, 2001, while Jaylen submitted a drawing apparently done in orange highlighter or marker of himself together with his sisters.
Factual Findings
The evidence elicited during this hearing showed that none of the children lived with their parents, due to the mothers' recidivistic behaviors as related to crime, incarceration and substance abuse. Telondia and Jaylen had lived with Wanda for virtually their entire lives. Tatiana had lived with Vicki from age one month until she was removed from the home by DCF in relation to this matter, although she spent much time at Wanda's home. LaToya lived with a family named Paradise, who resided next door to Wanda, for the first several years of her life. Thereafter, her primary residence was with Wanda. Vintia also lived with Wanda for most of her life. Finally, McKale lived for some period of time with "a babysitter" while his mother was in jail. Eventually, at some point, he too went and lived under Wanda's roof. None of these custody arrangements were ever formalized in court, although Wanda appears to have performed most of the normal parental tasks and obligations. Additionally, it appears that both Wanda and Vicki received monies from the State of Connecticut for the maintenance of these children.
Subsequent to their removal from Wanda and Vicki's homes, both Tatiana and LaToya made certain disclosures to their foster parent, DCF and to their therapists.
Social worker Melissa Bostrom testified that LaToya and Tatiana made various disclosures to her. Her testimony and her reports, which were CT Page 14455 admitted into evidence as full exhibits, discussed LaToya and Tatiana's physical abuse by Wanda and others and their sexual abuse and exploitation by Guitana, and Philip. Ms. Bostrom also noted that Telondia, Vinitia and McKale had always denied that any sexual or physical abuse took place. She did testify to Telondia's unusual behavior when the topic of abuse was broached, as well as Telondia's efforts to prevent her brother Jaylen from discussing the issue with the social worker. Finally, she did indicate that, although Jaylen would not discuss the subject of abuse, he did indicate that what LaToya and Tatiana said on the issue was "probably the truth".
The foster parent, Evelyn Doe, testified that she has had custody of both LaToya and Tatiana for fourteen months. She testified as to the children's disclosures about the sexual and physical abuse. LaToya indicated to her that while she lived at Wanda's house with her mother, Nannette, Wanda would physically beat and abuse her with rods and a plastic bat and that Wanda disliked her. Tatiana also revealed that her maternal aunt Sonya M. (Sonya) beat her with a curtain rod and that Vicki's sons physically abused her.
Evelyn Doe further testified that Tatiana also disclosed the sexual abuse with Philip in detail and that it was perpetrated in cars, in Philip's office and in a park. There was a set schedule for Tatiana to be taken to Philip, usually by Guitana, but she also reported having been taken to Philip by Vicki, Vicki's boyfriend and an individual named Fred, who lived in their housing project. Those persons were apparently paid for their services. Tatiana also told Doe that she revealed to Vicki that she was being sexually abused by Philip, but that Vicki told her to shut up or that she would tell Wanda. Guitana also struck Tatiana at least once for her reluctance to go to Philip to be sexually abused.
Evelyn Doe also testified that LaToya also disclosed the sexual abuse with Philip in detail, also indicating that she went once with Guitana, Tatiana and Jaylen to Philip's office, but had to wait until a lady left the office. Jaylen was apparently left outside coloring while the girls were being sexually abused. LaToya also stated that she, like Tatiana, was on a set schedule to sexually service Philip and that Roshanna, an older cousin, had been the first to be taken to Philip. Evelyn Doe also testified as to the disclosure that, on one occasion at Wanda's house, Roshanna greeted LaToya and Tatiana by saying, "been over to [Philip's], sucking his dick"?
LaToya disclosed to DCF in October, 2001 that Wanda had struck Sonya, Guitana and her mother, Nannette with a plastic bat and had pulled their hair and that Wanda had often struck Guitana in the face. She also CT Page 14456 admitted that Wanda had also struck all of the children and that she had been struck with the plastic bat as well. There was also a disclosure that Earl J. (Earl) had beaten the children.
On later dates, both Tatiana and LaToya made further disclosures to their foster parent, and to DCF. They indicated that there was a high level of sexual activity and sexual preoccupation at Wanda's house. Guitana and her boyfriend, "Bernard" were implicated in this behavior, specifically walking around with little or no clothing on, discussing sex frequently, and engaging in sexual activity within earshot of the children. The six children also became involved in sexual activity among themselves and Jaylen also engaged in sexual activity with a neighbor's daughter.
LaToya and Tatiana admitted having had sex with the adult male Philip and that Guitana, Vicki and Nannette took them to his office.
The information that LaToya and Tatiana disclosed to their therapists was similar. Dr. Spielman, a psychologist, testified that LaToya told her of the physical abuse by Wanda with a plastic bat and a coat hanger and by Guitana. She also reported to Dr. Spielman that she and Tatiana had been taken to Philip's office by Guitana and that she was subjected to digital penetration and oral sex abuse by Philip and that Guitana was paid for it. LaToya also admitted to the sexual activity in the home between the cousins. Dr. Spielman diagnosed LaToya as suffering from Post-Traumatic Stress Disorder (PTSD).
Ms. Burchell, a licensed clinical social worker, testified that she was Tatiana's therapist. She testified that Tatiana disclosed to her that her mother, Guitana, would bring her to Philip's office and home for oral sex. She also indicated that occasionally, two different men, as well as Vicki, brought her to Philip. She also indicated that there was sexual activity going on between the children at Wanda's house and that she was involved in it.
Tatiana also disclosed physical abuse and fear of her family members. She told Ms. Burchell that Vicki's children hit her, that her maternal grandparents Wanda and Earl whipped her and withheld food from her as a punishment. She indicated that she was afraid of Wanda and Vicki and believed that they would hurt her for having disclosed the sexual abuse. Ms. Burchell diagnosed her as suffering from sexual abuse and adjustment anxiety.
Both Vicki and Wanda testified at the November 13, 2001 hearing. Both denied that they knew that Tatiana or LaToya were being subjected to CT Page 14457 sexual abuse by Philip or Guitana. Both also denied any history with DCF or any prior criminal record. Vicki also testified that her mother, Wanda was a good parent and behaved appropriately in that capacity.
Wanda testified that she had had the five grandchildren who resided with her from the time she brought them home "from the hospital", which the court interprets to mean since birth. However, on cross examination, she did qualify this answer as it related to LaToya. She indicated that she was their primary care giver and that she and her late husband raised all five children due to their mothers' drug addictions. She also testified that all five children were born suffering from the effects of their mothers' drug addictions. She also testified that she knew that Guitana had been "picked up" for prostitution in the past. She testified that she did not know that Guitana was using Roshanna for the purposes of prostitution until an incident in 1993 involving Roshanna.
Wanda also denied using physical discipline on her grandchildren. She indicated that she closely supervised them, adequately fed them, made sure that they were clean, made sure that they attended school, and cooperated with the school concerning them.
Wanda indicated that she loved her grandchildren and looked upon them as if they were hers.
Wanda also brought a number of witnesses to testify to her fitness to parent, her appropriate behavior in the past as a parent and her good character. Also, some of these witnesses indicated that Earl was physically incapable of beating the children. Additionally, all parties stipulated to the content of the testimony of several teachers concerning Wanda that would have been given had they taken the stand.
Disposition
In the dispositional phase of a neglect trial, the focus of inquiry changes from the behavior of the parent or parents to what is in the best interest of the child or children. See In re Romance M., 229 Conn. 345,357, 641 A.2d 378 (1997); In re Katherine W, 2000 Ct. Sup. 13285,___ CLR ___, (2000) (B.Quinn, J). The case of In Re Alexander C.,60 Conn. App. 555 (2000) defines the best interest of the child as follows:
"[T]he primary focus of the court is the best interests of the child, the child's interest in sustained growth, development, well-being, and in the continuity and stability of its environment." CappettaCT Page 14458 v. Cappetta, 196 Conn. 10, 16, 490 A.2d 996 (1985). In In Re Joshua S., 260 Conn. 182 (2002), the Supreme Court held:
 We conclude that the trial court did not abuse its discretion in concluding that it was in Joshua S.' best interests to grant custody to the Vs. See Schult v. Schult, 241 Conn. 767, 777-78, 699 A.2d 134 (1997) (trial court vested with broad discretion to determine what is in child's best interests). "The best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of its environment. . . . The trial court is vested with broad discretion in determining what is in the child's best interests." (Citation omitted.) Id., 777.
The court finds that the statements of LaToya and Tatiana concerning physical and sexual abuse, as reported in the testimony of Evelyn Doe, DCF social worker Melissa Bostrom and therapists Dr. Rose Spielman and Ms. Joy Burchell to be believable and credible by a fair preponderance of the evidence. Their credibility as far as the sexual abuse allegations was firmly established as a result of respondent Guitana's admissions, both to law enforcement officials on July 22, 2001 and in Federal and State court on September 2, 2002, that she took these children to an adult male, Philip, for the purpose of Philip sexually abusing them. Their disclosures have been consistent, according to the therapists. Therefore, this court is not reluctant to accept these disclosures in whole, even though the physical abuse claims are not corroborated by other evidence or testimony, aside from Telondia's behavior and her refusal to allow her younger brother to discuss the maternal grandparents' abuse with social worker Bostrom.
Connecticut General Statutes Sec. 46b-56b sets forth the standards concerning the best interests of the child and custody of the parent:
 "Presumption re best interest of child to be in custody of parent.
In any dispute as to the custody of a minor child involving a parent and a nonparent, there shall be a presumption that it is in the best interest of the child to be in the custody of the parent, which presumption may be rebutted by showing that it would be detrimental to the child to permit the parent to CT Page 14459 have custody."
Where there is a parent who is able to care for the children and whose care for the children is not detrimental to their best interests, the statutory presumption makes it clear that the placement should be with the parent.
A. Fathers
The fathers of Telondia and LaToya are unknown; The putative father of Jaylen and Tatiana is Philip. Paternity testing has been ordered in reference to Philip, but has not been accomplished, due to the fact that Philip is in the custody of the United States Marshal for the District of Connecticut. No information was brought forth in the trial that would indicate any possible disposition of the matters that he is being held on, or any possible release date.
Lemuel W., the putative father for McKale M., was previously ordered to submit to paternity testing. In order to accommodate him, arrangements were made to perform the testing in the Baltimore, Maryland, area where he resides. DCF records indicate that he failed to comply with two different appointments for testing. He also arrived two days late for the start of the hearing. Both the State and McKale's attorney objected to his presence, and he was excluded from the remainder of the proceedings.
The whereabouts of Chester B., Vintia's putative father, is unknown.
In this case, it is clear that the State has shown that the putative fathers of these children have failed to perfect their interests in these proceedings and/or are either incapable of safely and effectively parenting these children and/or are unavailable to parent these children. CGS Sec. 46b-129 (j) requires that a guardian be "found to be suitable and worthy of such responsibility". These proceedings have shown these men wanting in terms of suitability and worthiness.
B. Mothers
Nannette, the mother of Vintia, LaToya McKale, is currently incarcerated within the state Department of Corrections, completing a five year sentence for a August 31, 2001 conviction for Larceny in the Second Degree and for Violation of Probation. Obviously, she will not be physically available anytime in the near future to care for these children. Nannette has an extensive criminal history in the State of Connecticut dating back to 1986, with additional convictions for Breach of Peace (2 counts), Criminal Mischief in the Third Degree, Robbery in CT Page 14460 the Second Degree, Violation of Probation (4 counts), Criminal Impersonation, Larceny in the Sixth Degree (9 counts), Failure to Appear in the Second Degree (5 counts), Larceny in the Fifth Degree (2 counts), Prostitution, and Welfare Fraud.
Her longstanding drug abuse has prevented her from parenting any of her five children, a fact which Nannette conceded in an interview with DCF. McKale and another child were born addicted to cocaine. The other child was eventually the subject of a termination of parental rights proceeding and adoption. Nannette also reported to DCF that her oldest child was in long term drug treatment at an out of state facility. Finally, LaToya disclosed to Evelyn Doe that she had provided clean urine for her mother so that her mother could obtain methadone. Based on the above, the Court finds that Nannette's behavior would be detrimental to any child of whom she had custody.
Guitana, the mother of Telondia, Tatiana, Jaylen, is currently held in the custody of the United States Marshal for the District of Connecticut. No information was brought forth in the trial that would indicate any possible disposition of the matters that she is being held on, or any possible release date. She is a drug addict and prostitute of long standing. DCF reports entered into evidence show that Guitana gave birth to Tatiana while in the Crossroads drugs treatment program and, subsequently, Jaylen was born testing positive for cocaine. Like her sister Nannette, Guitana has an extensive record in the State of Connecticut dating back to 1991, with convictions for Prostitution (4 counts), Theft of a Firearm, Interfering With A Police Officer, Possession of Narcotics (2 counts), Forgery in the Third Degree, Violation of Probation (3 counts) and Failure to Appear in the First Degree. Finally, Guitana admitted to law enforcement officials and in Federal and State courts that she procured LaToya and Tatiana for the purpose of the adult male, Philip, sexually abusing them. For these acts, Guitana received payment. The court believes that no child deserves to be delivered into whoredom by anyone, much less their own mother or maternal aunt. Therefore, the court finds that Guitana's behavior would be detrimental to any child of whom she had custody.
In this case, it is clear that the State has shown by a fair preponderance of the evidence that the mothers of these children are either incapable of safely and effectively parenting these children and/or are unavailable to parent these children. CGS Sec. 46b-129 (j) requires that a guardian be "found to be suitable and worthy of such responsibility". These proceedings have shown that Nannette and Guitana are unsuitable for guardianship and unworthy of guardianship. CT Page 14461
C. Interveners — Maternal Aunt
The maternal aunt, Vicki, has intervened on behalf of Tatiana. The evidence shows that Vicki has had custody of Tatiana since she was one year old until DCF took custody in July, 2001. Vicki had no legal right to custody of Tatiana, yet she admits having applied for and received welfare benefits for her. No evidence was produced showing that Vicki ever attempted to legalize the custody arrangement.
The evidence produced concerning the disclosures of Tatiana and LaToya indicate that:
 1. Tatiana was residing with Vicki while she was being exploited by Guitana and sexually abused by Philip.
 2. Vicki and her boyfriend drove Tatiana to Philip's office and were compensated for it.
 3. Vicki was the one adult that Tatiana told about the sexual abuse at the hands of Philip. Vicki did nothing to stop this abuse, and threatened to tell Wanda about Tatiana's disclosure.
 4. Tatiana indicated that she was physically abused by Vicki's children.
In her testimony on November 13, 2001, Vicki admitted knowing that Tatiana and her sister had gone to Philip's office. She also admitted that she knew that Telondia, Guitana's oldest daughter, had been born addicted to drugs and that Guitana had been in Crossroads, a drug treatment program, when Tatiana had been born. She testified that she had received information that Guitana was engaging in prostitution. Despite knowing this information, Vicki allowed Guitana access to Tatiana, including unsupervised night and weekend visits.
Vicki denied that Tatiana disclosed the sexual abuse to her or that Wanda physically abused the children.
The court finds the disclosures of Tatiana concerning Vicki's behavior to be credible. Simply based upon that finding, it would be clear that placement of any child in Vicki's home would not be in the best interests of any child, much less Tatiana. Having received information that Tatiana was being sexually abused by Philip and Guitana, Vicki should have, at the very least, taken some type of action in order to investigate any possible danger to her niece and to safeguard her niece from said danger. It appears that she took no steps to safeguard Tatiana from the baser CT Page 14462 depredations of Philip and Guitana.
However, of further concern to this court is the fact that Vicki would allow a child whom she was raising and for whom she had assumed responsibility, to go off unsupervised with an individual who was a drug addicted prostitute, a career criminal and a convicted felon. Unlike Wanda, Vicki never indicated that she felt bound to allow the children to go off unsupervised with their unsuitable mothers because she did not have legal custody. Even if she had such qualms, she should have sought court action to legalize her guardianship.
Based upon the above, this Court finds that Vicki is not an appropriate guardian for any of the six children in question. CGS Sec. 46b-129 (j) requires that a guardian be "found to be suitable and worthy of such responsibility". Vicki's malfeasance and nonfeasance in Tatiana's case make it clear that Vicki cannot or will not protect these children from danger and is not suitable or worthy of such responsibility. It is not in the best interests of any of these children that they go to the custody of Vicki, the maternal aunt.
D. Interveners — Maternal Grandmother
The maternal grandmother, Wanda, has intervened on behalf of all of the children. The evidence shows that Wanda has had custody of LaToya, Vintia, McKale, Telondia, and Jaylen for much, if not all of their young lives. The evidence also shows that Tatiana spent much time at her grandmother's house. Additionally, testimony from the interveners' witnesses and other evidence shows that Wanda also raised Sonya's daughter Roshanna. Wanda had no legal right to custody of LaToya, Vintia, McKale, Telondia, and Jaylen, yet she admits having applied for and received welfare benefits for them. She performed the duties of a custodial parent, including but not limited to feeding, clothing, and housing. She disciplined the children and appeared at school on behalf of the children.
Wanda testified that she knew that she did not have legal custody of LaToya, Vintia, McKale, Telondia, and Jaylen. No evidence was produced showing that Wanda ever attempted to legalize the custody arrangement.
The evidence produced concerning the disclosures of Tatiana and LaToya indicate that:
1. LaToya was residing with Wanda while she was being exploited by Guitana and sexually abused by Philip. CT Page 14463
2. The children engaged in sexual activity in Wanda's home.
 3. The children were exposed to sexually related discussions and activity in Wanda's home.
4. The children were exposed to drugs and drug use in Wanda's house.
 5. The children were physically disciplined in Wanda's house in an inappropriate manner.
6. The children were exposed to convicted felons in Wanda's house.
Through testimony and other evidence, Wanda has denied that she knew of the sexual abuse, denied the presence of sexually related discussions and activity in her house, denied the presence of drugs and drug use in her house and denied that the children were physically disciplined in her house. Her witnesses have indicated that she would not be the type of person that would permit any type of illicit activity to take place under her roof. She admitted that she did allow the children to go with their mothers on occasion, despite the mothers' inappropriateness. She testified that she did so because she lacked legal custody of the children and could not stop the mothers.
The court finds that the State did not prove, by a fair preponderance of the evidence, that Wanda actually knew of the sexual abuse that her daughter Guitana was causing Tatiana and LaToya to be subjected to at the hands of Philip. Unlike Vicki, to whom Tatiana actually disclosed the sexual abuse, there was insufficient evidence show that Wanda knew of the sexual abuse or was told of it.
Nevertheless, the court finds that the State did prove, by a fair preponderance of the evidence, that Wanda should have known of the sexual abuse that her daughter Guitana was causing Tatiana and LaToya to be subjected to at the hands of Philip.
The State did establish that Wanda did have knowledge of a possible propensity by Guitana to engage others in prostitution. There was credible evidence and testimony that, in approximately 1993, the Waterbury Police Department (WPD) and DCF approached Wanda concerning allegations that Guitana was taking Roshanna with her to witness sexual activities and be sexually abused by men. The report concerning this incident indicates that Wanda refused to assist in the furtherance of this investigation. She claimed that she had already told the offending male that she would kill him if he touched Roshanna again. DCF indicated that they told Wanda not to allow unsupervised contact between the children and Guitana or CT Page 14464 Nannette.
Credible evidence, as well as Wanda's own admission, shows that she refused to heed DCF's advice and still allowed LaToya to accompany Guitana on what has been described as "a regular schedule". The court believes that, having been warned about Guitana's propensities, Wanda should have not allowed LaToya to accompany Guitana unsupervised for any purpose. Additionally, Guitana was LaToya's aunt, not her mother, so Wanda's excuse that she did not have legal custody lacks merit.
Even if LaToya were Guitana's own child, Wanda should have taken measures to either supervise them, or obtain legal guardianship so as to be able to dictate the grandchildren's whereabouts and associations.
Other evidence was also elicited showing Wanda's inability to adequately protect the children from harm and/or misadventure. A report from DCF which was admitted as a full exhibit indicates that Wanda allowed Roshanna's father, Ronald H. (Ronald), after his release from prison in 1996, to move into her home despite his extensive criminal history and substance abuse problems. Clearly this type of person is an inappropriate individual to allow around small children.
In April, 1999, D.C.F. indicated that Roshanna reported that her father, Ronald, was sexually abusing her. At that time, she indicated that she had made this disclosure to Wanda four months previously.
Wanda has also failed to comply with other D.C.F. orders concerning Roshanna. In August, 1999, Roshanna was adjudged a delinquent and was remanded to a D.C.F. group home. She was allowed to visit Wanda's house that Thanksgiving. D.C.F. indicated that they told Wanda that Roshanna was not to have any contact with her father, who was facing criminal charges for sexually abusing Roshanna. Upon her return to the group home, Roshanna indicated that she spent considerable time with her father.
Also, while being interviewed by Anthony Campagna, PhD, for a psychological assessment and evaluation, Wanda indicated that she stopped giving Roshanna a prescribed medication, Ritalin, prior to entering kindergarten. Wanda based this decision, which appears to have been done without professional input, because she felt Roshanna was "too calm, too quiet". When one considers this decision in light of Roshanna's own behavioral difficulties as reported by the interveners' own witness, Dorothy LaCoeurs, the first grade teacher for Roshanna, Vintia, LaToya and McKale at Tinker School, one must question Wanda's ability to properly and wisely make judgements for any child in her care. CT Page 14465
D.C.F. records also report that Nannette disclosed that she had been sexually abused by a male babysitter when she was a little girl. Nannette indicated that when she was older, she confronted the babysitter, who confirmed the abuse. When she disclosed this to her mother, Wanda refused to believe it.
When the information about these incidents are combined with Wanda's refusal to assist in the investigation of the person or persons who may have sexually assaulted Roshanna in 1993, it becomes evidence of a pattern of a failure to make intelligent and reasoned judgments concerning the upbringing of any children.
As to the allegations of physical abuse in Wanda's house, the court finds the claims concerning this issue made by Tatiana and LaToya to be credible. However, giving Wanda the benefit of the doubt concerning this issue, it appears that this probably considered of inappropriate attempts to discipline the children. However, since DCF does not allow children under its care to be physically disciplined, it would not be appropriate to return these children to Wanda under any status which involved DCF supervision.
Another issue raised by the State concerns Wanda's failure to properly supervise the grandchildren. There was evidence that the grandchildren engaged in sexual activity in the home with each other and with one other child. There was also information that Jaylen was injured while jumping out of a window and that he set two fires. Taken individually, each incident may be something that may unfortunately occur in the rearing of any small child. However, the totality of these incidents appears to exceed what one would consider random ill fortune.
Finally, Wanda testified on November 13, 2001, that, if she were awarded custody of the grandchildren, she would leave the State of Connecticut with the grandchildren. This court believes that such a plan would not be in the best interest of the children. They appear to have all been born in Connecticut and have most of their ties here. Furthermore, the public agencies that are best suited to aid them are in Connecticut.
Wanda produced several witnesses, through actual testimony and through stipulation, attesting to her good character and ability to care for her grandchildren. These individuals were teachers, school personnel, friends and neighbors. However, most of these witnesses appeared to have spent little or no time inside the home itself The testimony of the one witness who actually had spent time there, Vincent Austin, Jr., related primarily CT Page 14466 to a period of time predating the sexual abuse of Tatiana and LaToya. The court found Austin's claimed alleged lack of knowledge concerning the underlying allegations to be troubling. Additionally, it is curious that Austin failed to disclose that he had once dated Guitana until confronted on cross examination by the Assistant Attorney General.
Conclusion
As previously stated, best interest of the child is defined as:
 `the child's interest in sustained growth, development, well-being, and in the continuity and stability of its environment." Capita v. Capita, 196 Conn. 10, 16, 490 A.2d 996 (1985).
 In Re Alexander C., 60 Conn. App. 555 (2000).
Having concluded that the parents of these children and the maternal aunt Vicki are not viable resources for these children, it remains to consider the maternal grandmother Wanda. This court firmly believes that the State has proven by a fair preponderance of the evidence, that it would not be in any of the grandchildren's best interests to vest guardianship in Wanda.
The circumstances under which these children lived, as shown by a fair preponderance of the evidence by the State, was clearly inappropriate and detrimental. Wanda's failure to be vigilant concerning the sexual abuse to LaToya created an atmosphere that was contrary to every decent thing known in parenting. The fact that Tatiana and LaToya were being sexually abused by Philip was not a dirty little secret known to just the perpetrators and the victim. There was a disclosure which indicated that Roshanna had known that Tatiana and LaToya were being sexually abused by Philip, based on the rather vulgar comment that Roshanna made to Tatiana and LaToya. That comment is reported elsewhere in this memorandum. This court believes that if Roshanna knew about this abuse, then Wanda should have known had she exercised the normal and reasonable vigilance expected of any parent.
The Court further finds that Wanda's propensity to allow the grandchildren to go off with Guitana and Nannette to be clearly contrary to the best interests of any of the children. She knew of Guitana and Nannette's criminal and antisocial habits, including the claim that Guitana tried to prostitute Roshanna in 1993, yet she failed to take even minimal steps to safeguard her grandchildren.
In her testimony of November 13, 2001, Wanda attempted to justify this CT Page 14467 failure by claiming that she had no legal right to keep the mothers from the children. However, on cross examination, Wanda admitted to the Assistant Attorney General that occasionally she prevented Jaylen from going with Guitana based upon Guitana's condition.
The Marxist author and revolutionary Rosa Luxemburg once said, "If one attempts to teach truth, one must teach it whole- or not at all." Something similar could be said of Wanda. If one attempts to parent a child full-time, one must carry out all of the responsibilities of a parent. One may not pick and choose which responsibilities he or she is willing to face. Wanda failed to make best efforts to keep the grandchildren safe from the pernicious influences of her daughters, whether those influences were Guitana and her boyfriend walking around with little clothing on, Guitana and her boyfriend having sex within earshot of the children, drug use by Guitana in the home, exposure of LaToya to drug use by Nannette, or the prostitution of her granddaughters by Guitana. This court questions whether Wanda has the willpower to resist the pleas of her adult daughters, regardless of what risk the grandchildren may be exposed to as a result. This is an issue regardless of whether Nannette and Guitana are incarcerated or at liberty in the community.
Further, Wanda did not properly supervise her grandchildren in the home itself, as cumulatively evidenced by the sexual atmosphere in the home, the grandchildren having sex with each other and with at least one other child in the ho me, by Jaylen setting fires in the home and injuring himself by jumping out of a window. The court also notes that Tatiana, though living with Vicki, did engage in sexual behavior with her cousins at Wanda's house.
Another area in which Wanda has failed to meet the best interest of her grandchildren concerns her failure to comply with recommendations of D.C.F. and service providers. In 1993, after D.C.F. warned Wanda to keep the grandchildren away from her daughters, Wanda failed to do so. In 1999, Wanda admitted to Dr. Campagna that she discontinued Roshanna's prescribed medicine, Ritalin, prior to Roshanna entering kindergarten. In that same year, Wanda defied D.C.F. orders and allowed Roshanna to have contact with her father, Ronald, during a home visit. At the time, the father was facing charges of having sexually abused Roshanna.
Wanda also allowed convicted felons such as Roshanna's father and Guitana's boyfriend, to live in her home in company with the children.
Although Roshanna is not a party to this action, the court believes that she is an important factor in determining the best interests of her CT Page 14468 cousins. Georges Santayana, the twentieth century philosopher, writer and poet, once wrote that, "Those who cannot remember the past are condemned to repeat it." One can see the effects of Wanda's upbringing, whether wilful or not, in her own children and in the older grandchildren.
Among her four daughters, Wanda has four teenage mothers. Three of the four daughters, Guitana, Nannette and Sonya, have extensive criminal records and substance abuse problems. Guitana and Nannette are convicted prostitutes. Nannette was also a victim of childhood sexual abuse. Wanda's son Shanaar has apparently had none of the problems suffered by the three daughters.
According to D.C.F., Wanda has helped raise Guitana, Nannette and Sonya's nine children, due to their substance abuse and criminal involvement. Nannette's oldest son Dante and Sonya's daughter Roshanna have battled substance abuse problems and have been involved with the criminal justice system. As of February, 2002, Dante was in a residential drug treatment program in New York City, while Roshanna was in a D.C.F. placement, attending school and receiving therapy. While in Wanda's custody, D.C.F. reports that Roshanna was sexually abused and exposed to sexual activities. Guitana also attempted to exploit her for prostitution.
Life at Wanda's home has been shown by a fair preponderance of the evidence to be contrary to sustained growth, development and well-being of the grandchildren.
The court has also considered the wishes of the grandchildren in this matter. Vintia, McKale and Telondia wish to return to their grandmother. LaToya and Tatiana do not want to return to their grandmother. Jaylen wishes to remain where he is presently, but wants to keep his options open in case he wants to return to his grandmother in the future.
In Azia v. Dilascia, 64 Conn. App. 540 (2001), the Appellate Court discussed the issue of child preference:
"An appellate court will not disturb a trial court's orders in domestic relations cases unless the court has abused its discretion or it is found that it could not reasonably conclude as it did, based on the facts presented. . . . In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action." (Citation omitted; internal quotation marks omitted.) Costa v.CT Page 14469 Costa, 57 Conn. App. 165, 168, 752 A.2d 1106 (2000).
 Our Supreme Court has stated: "In making a determination of custody . . . the trial court is bound to consider the child's present best interests and not what would have been in her best interests at some previous time. . . . [T]he court must . . . take account of the parents' past behavior, since it must evaluate their present and future parenting ability and the consistency of their parenting for the purpose of determining which parent will better foster the children's growth, development and well-being." (Citation omitted; internal quotation marks omitted.) Blake v. Blake, 207 Conn. 217, 224-25, 541 A.2d 1201
(1988).
 "[W]hether the child's preferences and feelings as to custody and visitation are a significant factor in the court's ultimate determination of the best interest of the child will necessarily depend on all the facts of the particular case, including the child's age and ability intelligently to form and express those preferences and feelings." Gennarini v. Gennarini, 2 Conn. App. 132, 137, 477 A.2d 674 (1984); see also General Statutes 46b-56 (b).fn8 "Section 46b-56 (b) does not require that the trial court award custody to whomever the child wishes; it requires only that the court take the child's wishes into consideration. . . . The ultimate concern of the trial court is to decide what is in the best interests of the child. . . . Although the child's wish is one factor for the court to consider in making that decision, it is certainly not the only one." (Citations omitted.) Knock v. Knock, 224 Conn. 776, 788-89, 621 A.2d 267 (1993). "[E]ven when [a child's preference] is elicited, the information may be of questionable accuracy. A child caught up in the maelstrom of family strife may produce, to the psychologically untrained eye and ear, distorted and thus misleading images not only of the child's parents but of the child's own feelings; and those feelings themselves may be transient." Gennarini v. Gennarini, supra, 137.
The court does not doubt that Vintia, McKale and Telondia earnestly do wish to return home. However, the best interest of the child is the CT Page 14470 paramount concern; child preference is but a factor in the decision. Under these circumstances, it would be rash to return any of the children to Wanda's home.
The recommendation of the guardians at litem is that all six of these children be committed to D.C.F. Both guardians at litem believed that Wanda is incapable of protecting the children from harm.
This recommendation has also been made by the Assistant Attorney General.
For the reasons indicated above, this court agrees with them.
 ORDER
Therefore, it is the order of this court that TATIANA J., LaTOYA M., TELONDIA J., JAYLEN J., VINTIA M., and McKALE M., be committed to the custody of the Department of Children and Families until further order of the Court.
 ___________________ Taylor, J.
Dated: October 28, 2002
 APPENDIX Children: DOB Father Mother
1. Tatiana J. 1992 Philip(putative) Guitana
2. Telondia J. 1990 ? Guitana
3. Jaylen J. 1993 Philip(putative) Guitana
4. LaToya M. 1990 ? Nanette
 5. Vintia M., aka Vinitia 1988 Chester B. (putative) Nanette
6. McKale M. 1992 Lemeul W. (putative) Nanette
Respondent DOB Relationship
1. Guitana 1971 Mother of Telondia J., Tatiana J., Jaylen J. CT Page 14471
 2. Nanette 1965 Mother of Dante, Vintia M., LaToya M. McKale M.
 Intervenors DOB Relationship
 1. Wanda ? MGM of Dante, Roshanna M., Telondia J., Tatiana J., Jaylen J., Vintia M., LaToya M. McKale M.
 Mother of Sonya, Nannette, Sonya, Guitana Shanaar
 2. Vicki ? MAunt to Roshanna M., Telondia J., Tatiana J., Jaylen J., Vintia M., LaToya M. McKale M.
 Sister of Sonya, Nannette, Guitana Shanaar
 Others DOB Relationship
 1. Roshanna Daughter of Sonya. Granddaughter of Wanda. Niece of Nannette, Sonya, Guitana, Vicki Shanaar
 Cousin of Dante, Telondia J., Tatiana J., Jaylen J., Vinitia M., LaToya M. McKale M
 2. Philip Putative Father to Jaylen J. Tatiana J.
3. Lemeul W. Putative Father to McKale M.
4. Chester B. Putative Father to Vinitia M.
5. Earl (deceased) Late husband of Wanda
6. Ronald Father of Roshanna CT Page 14472